2016 FEB 29 AM 9: 3

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71912-2-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| TRAVIS LEE LILE, | ) ) | |
| Appellant. | ) ) | FILED: February 29, 2016 |
| | ) | |

APPELWICK, J. — Lile appeals his assault convictions and his conviction for resisting arrest. He contends that the trial court erred when it denied his affidavit of prejudice as untimely. He claims that the trial court erred when it denied his motion to sever counts. Lile asserts that the trial court made several evidentiary errors. He argues that one of those evidentiary errors resulted in the State improperly impugning defense counsel. He maintains that the trial court erred when it denied his request for a self-defense jury instruction. He alleges that all these errors amounted to cumulative error warranting reversal. We affirm.

## FACTS

On February 16, 2013, Taylor and Alyssa Powell[1] went out to drinks with Christopher Rowles and his girlfriend, Amanda Millman, in downtown Bellingham. Over the course of the evening, Millman had about a beer and a half and part of a mixed drink. Rowles had two drinks. Taylor was drinking more than Rowles. Alyssa became very intoxicated over the course of the evening. As the group decided to leave a nightclub at the end of the night, Millman was helping Alyssa walk, because she was so intoxicated that she was stumbling and swaying back and forth. The group walked down a hill on a sidewalk. The group encountered another group on the sidewalk—Travis Lile's group.

Lile and his friends also went out in downtown Bellingham that night. They had been drinking at a party earlier in the evening and had walked downtown to go to a bar. Lile was with Sean Duff, Cameron Moore, and Allen Owens. Lile, Owens, and Duff are in the Navy. Lile's group was walking up the hill on the same sidewalk as the other group walked down the hill.

As the groups walked toward each other, Taylor and Rowles were about 10 to 15 feet behind Millman and Alyssa. As Millman and Alyssa passed Lile's group, it appeared to Rowles that Millman bumped Lile accidentally with her purse or elbow. Lile's group yelled things at the women as they passed, and Lile called the women a profane name. Alyssa said, "F-U." Millman turned around and saw Lile walking backward up the hill. At that point, Lile turned around and bumped

---

[1] We refer to the Powells by their first names for the sake of clarity. No disrespect is intended.

shoulders with Rowles as Rowles walked down the hill. According to Rowles, the two passed each other, Lile then yelled, "hey" at Rowles, and when Rowles turned around, Lile punched him. According to Lile, he threw the punch, because Rowles and Powell were in his face and he felt threatened. A scuffle between the men ensued. Millman approached the fight yelling at the men to stop. Lile hit her. Lile's punch knocked Millman out, knocked some of her teeth out, and fractured one of her facial bones.

Officer Jeremy Woodward was on patrol in downtown Bellingham that night. Officer Woodward heard yelling and saw a commotion on a sidewalk near a bar. From his police car, he saw Lile punch Rowles in the face. Around the time Officer Woodward was exiting his police car, Lile had turned and punched Millman.

Officer Woodward ran toward Lile's location. At that point, Lile was already walking away. As Officer Woodward approached Lile, he yelled, "[S]top, police. You're under arrest." Officer Woodward attempted to grab Lile by his shirt. But, Lile knocked Officer Woodward's hand away and took off running. Officer Woodward chased Lile who eventually tripped and fell. Officer Woodward struggled with Lile. Lile struck Officer Woodward on the right side of his face hard enough that it knocked Officer Woodward off balance and knocked his glasses off. The struggle continued. Officer Woodward tried to apply a lateral visceral neck restraint to get Lile to comply, but Lile tucked his chin and Officer Woodward was not able to apply it. Eventually, after another officer arrived, the officers were able to handcuff Lile.

3

Lile was charged with assault in the second degree for assaulting Millman, assault in the fourth degree for assaulting Rowles, assault in the third degree for assaulting Officer Woodward, and resisting arrest. After a jury trial, the jury found Lile guilty of all charges. Lile appeals.

## DISCUSSION

Lile argues that the trial court erred when it denied his affidavit of prejudice as untimely. He contends that the trial court erred when it denied his motion to sever. He claims that the trial court abused its discretion when it refused to permit evidence of Rowles's previous orders of adjudication for domestic violence after Rowles testified on cross-examination that he was not a "fighting person." Lile asserts that the trial court abused its discretion when it admitted evidence of whether Lile considered himself to be a warrior during cross-examination and when it required Lile to answer the State's question about the meaning of his tattoo. He maintains that the trial court abused its discretion when it allowed witnesses to testify about events that insinuated defense counsel improperly coached the defense witnesses. He alleges that it was error for the State to argue in closing argument that Owens said he would not have thrown a punch like Lile did in the same situation. Lile argues that the trial court erred when it denied Lile's proposed self-defense instruction for the third degree assault charge against a police officer, because Lile did not know that he was assaulting an officer. Finally, Lile claims that he is entitled to a new trial based upon the cumulative error doctrine.

4

I.    Affidavit of Prejudice and Motion to Sever

Lile first argues that the trial court erred when it denied his affidavit of prejudice as untimely. Lile filed a motion and declaration of counsel to recognize his affidavit of prejudice and exclude Judge Ira Uhrig from making any rulings.

Affidavits of prejudice are governed by RCW 4.12.040 and 4.12.050. State v. Dennison, 115 Wn.2d 609, 619, 801 P.2d 193 (1990). RCW 4.12.040 is a mandatory, nondiscretionary rule allowing a party in a superior court proceeding the right to one change of judge upon the timely filing of an affidavit of prejudice under RCW 4.12.050. Id.

RCW 4.12.050(1) provides some limitations for when the motion and affidavit may be filed. It states that the party may file the motion,

> PROVIDED, That such motion and affidavit is filed and called to the attention of the judge before he or she shall have made any ruling whatsoever in the case, either on the motion of the party making the affidavit, or on the motion of any other party to the action, of the hearing of which the party making the affidavit has been given notice, and before the judge presiding has made any order or ruling involving discretion, but the arrangement of the calendar, the setting of an action, motion or proceeding down for hearing or trial, the arraignment of the accused in a criminal action or the fixing of bail, shall not be construed as a ruling or order involving discretion within the meaning of this proviso.

Id.

A.  Discretionary Ruling

Whether the trial court properly denied Lile's motion for an affidavit of prejudice turns on whether Judge Uhrig made any discretionary rulings prior to Lile filing the affidavit. After Lile was arraigned, the parties brought several motions to continue before Judge Deborra Garrett. After many additional continuances, a trial

setting order was filed on January 15, 2014 setting the matter for a January 22, 2014 status conference and February 3, 2014 for trial.[2] Judge Uhrig presided at the hearing on January 22. Judge Uhrig orally granted a motion to continue the trial date. A written order continuing the trial date from February 3 to February 10 was signed by Judge Uhrig and filed on February 3.

On February 6, the parties went before Judge Uhrig on Lile's motion to sever. As soon as the parties went on record, William Johnston informed Judge Uhrig that Lile filed an affidavit of prejudice against him that morning. The State argued that the affidavit was untimely, because Judge Uhrig made a discretionary decision on January 22 when he granted the motion to continue. On February 21, Judge Uhrig entered a written order formally rejecting Lile's affidavit of prejudice as untimely because of his previous oral continuance and because he had entered a written order continuing the trial from February 3 to February 10.

Lile argues that Judge Uhrig's ruling on the motion to continue was not discretionary. The general rule is that granting or denying a continuance motion is a discretionary ruling, because the court must consider various factors such as diligence, materiality, due process, a need for an orderly procedure, and the possible impact of the result on the trial. In re Recall of Lindquist, 172 Wn.2d 120, 130-, 258 P.3d 9 (2011). The general rule applies in cases in which one party has

---

[2] The State asserts that it was Judge Uhrig who granted the continuance at a status hearing on January 13, 2014. But, there is nothing in the record confirming that this occurred. And, the order filed January 15 was signed by Commissioner Martha Gross. The order was based on agreement between the prosecutor, defense counsel, and the defendant.

unilaterally moved for a continuance. See, e.g., Lindquist, 172 Wn. 2d at 126; State v. Maxfield, 46 Wn.2d 822, 829, 285 P.2d 887 (1955); Donaldson v. Greenwood, 40 Wn.2d 238, 241-42, 242 P.2d 1038 (1952). But, a trial judge does not exercise discretion in finding no need to rule on a continuance. State v. Guajardo, 50 Wn. App. 16, 19, 21, 746 P.2d 1231 (1987).

The State argues that the general rule should control here and that Judge Uhrig's ruling was discretionary. The State relies predominantly on Lindquist to support its argument. Lindquist moved to continue a hearing, because he was on vacation and unable to appear. 172 Wn.2d at 126. A continuance would have delayed the hearing beyond a statutory time limit. Id. Therefore, the trial judge denied the motion. Id. Subsequently, the opposing party filed an affidavit of prejudice against the trial judge. Id. The trial judge dismissed the affidavit of prejudice as untimely, because it was filed after he had made a discretionary ruling on Lindquist's motion to continue. Id. at 126-27, 130-31.

In affirming, the Lindquist court reasoned that unlike merely preparing the calendar, granting continuances involves the exercise of discretion. Id. at 130-31. It noted that the trial judge was required to invoke his discretion in weighing whether delaying the hearing to allow Lindquist to be present justified continuing the hearing beyond the statutory deadline. Id. at 131.

By contrast, Lile relies on State v. Dixon, 74 Wn.2d 700, 703, 446 P.2d 329 (1968), arguing that it is the closest case factually to his. He argues that Judge

7

Uhrig's decision was not discretionary, because it was merely a calendaring matter.

Dixon had filed a motion to suppress and a motion to dismiss, and noted them to be heard in October. Dixon, 74 Wn.2d at 700. The State moved to renote two of Dixon's motions for September. Id. The judge handling the motions calendar heard argument and granted the State's motion to renote. Id. at 701. Subsequently, Dixon filed an affidavit of prejudice against that judge when the hearing on the merits commenced. Id. The motion calendar judge concluded that Dixon's affidavit of prejudice was untimely, because his ruling on the State's motion to renote was discretionary. Id.

The Dixon court reversed and concluded that Dixon's affidavit of prejudice was timely filed. See id. at 703. Because of the King County Superior Court's rotating sitting schedule for judges on the motion calendar, a different judge would have heard the merits of the motions depending on whether it was heard in September or October. Id. Therefore, Dixon was uncertain as to whether the judge he sought to remove would actually hear the merits of his motions until after a ruling on the motion to renote was already made by that judge. Id. The Dixon court stated,

> With the uncertainty as to which judge would be the ultimate judge at the hearing on the merits thus injected into the cause by the state's motion, it would be manifestly unfair to compel petitioner to expend, mayhaps uselessly, his motion and affidavit of prejudice prior to the conclusion of the hearing on the state's motion.

Id. The facts of the case are not those here. Dixon did not involve a continuance of the trial date. It involved a change of date to hear the motions. It involved unique considerations of fairness. But, Lile points to a comment of the Dixon court subsequent to its decision for relief:

> Furthermore, it is our view that the setting and/or renoting and resetting of a cause or motion for hearing on the merits is a preliminary matter falling squarely within the ambit and contemplation of the proviso to RCW 4.12.050. This proviso specifically excludes from the discretionary classification otherwise referred to therein those orders and/or rulings relating to 'the arrangement of the calendar' or 'the setting of an action, motion[,] or proceeding down for hearing or trial.' This language, in our view, clearly embraces the calendaring action taken by the motion calendar judge in resetting petitioner's motions pursuant to the state's motion.

Id. (quoting RCW 4.12.050). This statement is an accurate application of the statute to the facts in Dixon. However, it cannot be regarded as establishing a rule that every calendaring motion, including trial continuances, are nondiscretionary acts. Many subsequent cases, including those cited above, hold otherwise.

An exception to the general rule governs when both parties act in concert by stipulating or making a joint motion. In State ex rel. Floe v. Studebaker, 17 Wn.2d 8, 15, 134 P.2d 718 (1943), litigants signed a stipulated order consolidating two court actions for the purpose of trial and continuing the case so that it could be consolidated. The trial court entered an order continuing the case and noted that the court reserved its decision on the consolidation. Id. at 15-16. The court later entered an order consolidating the cases. Id. at 16. The Floe court held that affidavits of prejudice filed after the orders were timely. Id. at 16. It reasoned that a court is not required to exercise discretion when asked to make an order involving preliminary

9

matters such as continuing a case, where all the parties have stipulated to that order. Id. at 17.

Years later, in State v. Parra, 122 Wn.2d 590, 591-92, 599, 859 P.2d 1231 (1993), Parra argued that the judge did not make a discretionary decision when it granted both the defense's and the State's motions submitted in an omnibus order. The Parra court discussed Floe and noted that for purposes of an affidavit of prejudice, stipulated orders do not invoke the court's discretion:

> "Neither do we think it can be said that the court was called upon by any of the attorneys connected with this case to make any ruling involving discretion, as contemplated by the statute. We do not believe it can be said that the court is required to exercise discretion when asked to make an order involving preliminary matters such as continuing a case, or for consolidation, where all the parties have stipulated that such order be made."

Id. at 599 (emphasis omitted) (quoting Floe, 17 Wn.2d at 17). The Parra court reasoned that the distinction drawn in Floe relating to stipulations makes sense:

> When first enacted in 1911, the affidavit of prejudice statute did not contain a timeliness requirement. In order to avoid the absurd result of parties invoking the court's discretion and then waiting to see the disposition of the judge before asserting the right, this court read a timeliness requirement into the statute in State ex. Rel. Lefebvre v. Clifford, 65 Wash. 313, 315, 118 P.40 (1911).

Id.

The Parra court then noted that the Floe court implicitly acknowledged that many issues may be resolved between the parties and presented to the court in the form of an agreed order. Id. at 600. It noted that the matters will generally resolve pretrial disputes regarding issues of admissibility of evidence, discovery, identity of witnesses, and anticipated defenses. Id. The Parra court reasoned that if the parties

have resolved such issues among themselves and have not invoked the discretion of the court for such resolution, then the parties will not have been alerted to any possible disposition that a judge may have toward their case. Id. And, if the court then refuses to accept a stipulation, the effect is generally to place the parties in their original positions regarding the matters affected by the stipulation. Id. at 601. Each party is then free to seek resolution of the issue through a motion before a judge. Id.

Generally, a stipulation is an agreement between the parties to which there must be mutual assent. Id. To be effective, the terms of a stipulation must be definite and certain. Id. Stipulations are favored by courts and will be enforced unless good cause is shown to the contrary. Id.

Parra argued that an omnibus order submitted by both parties indicating which motions they intended to pursue was akin to a stipulation, because neither party objected to the entry of the order. Id. at 599. Parra claimed that because neither the State nor the defense objected, the judge's discretion was not invoked. Id. The Parra court rejected this argument, and concluded that a party's decision not to object to opposing counsel's motion does not constitute a stipulation by that party. Id. at 601-02.

Here, prior to going before Judge Uhrig, the State had suggested to Johnston that they continue the trial for a week, and Johnston said it would be no

problem. At the hearing, counsel for both Lile and the State verbally proposed to continue the case one more week until February 10:

> MR. JOHNSTON: Morning, Your Honor. Mr. [James] Hulbert[3] and I were talking about the case and we propose to move the case one week.
>
> THE COURT: Okay.
>
> . . . .
>
> MR. JOHNSTON: This is what's referred to, Your Honor, as the Super Bowl continuance.[4]
>
> THE COURT: Okay.
>
> (Hearing is adjourned)

(Emphasis added.) By informing the court that "we" propose to continue the case one week, Johnston signaled to the trial court that the motion was a joint motion. On February 3, the State appeared before Judge Uhrig for the formal entry of a written order setting the matter for February 10. An order setting trial date was filed, continuing the trial from February 3 to February 10. The findings indicated that the matter was reset by agreement of the prosecutor, defense counsel, and the defendant. The minutes for the February 3 status hearing indicate that an agreed order setting trial date had been signed during the hearing.

Here, unlike in Floe, there was no written stipulation presented to the trial court at the time Judge Uhrig made his oral ruling. However, the record reveals an agreement between the parties to continue to a specific date. The attorneys

---

[3] Hulbert represented the State.

[4] Super Bowl XLVIII took place on February 2, 2014—the day before trial was scheduled to begin. SUPER BOWL XLVIII, https://en.wikipedia.org/wiki/2013_Seattle_Seahawks_season (last visited February 9, 2016).

and the court all treated the oral motion to continue as a joint motion at the time it was made. And, the parties and the court treated the ensuing order as an agreed order when it was entered on February 3. Under the reasoning in Parra, the parties' presentation of the joint oral motion to continue to the trial court was akin to a stipulation resulting in the agreed written order of February 3. Had Judge Uhrig denied the motion, either attorney would have been free to make a different motion. We hold that Judge Uhrig's acceptance of the joint motion and signing of the agreed order were not discretionary acts.[5] Therefore, Judge Uhrig erred in treating his ruling as a discretionary act, concluding that the affidavit of prejudice was untimely, and denying the change of judge on February 6.

B. Reversible Error

Although a change of judge should have been granted, the State asserts that reversal is not warranted where the judge sought to be removed did not preside over the trial. Judge Uhrig did not preside over Lile's trial. Judge Garrett

---

[5] The State also relies on Dennison, 115 Wn.2d at 620, to support its assertion that Judge Uhrig's decision on the continuance was discretionary. In Dennison, the court specifically noted, in a footnote, that although the parties stipulated to a continuance, the trial court decided whether to grant or deny a continuance in its discretion. Id. at n.10. Similarly, in State v. Espinoza, 112 Wn.2d 819, 821-22, 823, 774 P.2d 1177 (1989), reversed in part on other grounds, 112 Wn.2d 819, 774 p.2d 1177 (1989), the court applied the general rule when considering whether two different continuance rulings were discretionary. One ruling was on a motion to continue brought by only the defendant, but the other was on a motion to continue brought by defendant and joined by the State. Id. at 821-22. The Espinoza court cited to the general rule and did not distinguish between the two continuances. Id. at 823. Both the Dennison footnote and Espinoza were in conflict with Floe when they were decided. And, neither the Dennison court nor the Espinoza court cited to Floe or provided any indication that they were aware stipulations are treated differently in this context. Because the Washington Supreme Court subsequently reaffirmed Floe in Parra, we adopt the reasoning in Parra on this issue.

did. But, the State provides no authority to support its assertion. The State claims that it was unable to find any supporting authority, because in all other cases, the judge who improperly denied the affidavit of prejudice presided over the trial.

Once a party timely complies with the terms of the affidavit of prejudice statutes, the judge to whom it is directed is divested of authority to proceed further into the merits of the action. State v. Cockrell, 102 Wn.2d 561, 565, 689 P.2d 32 (1984); Dixon, 74 Wn.2d at 702; In re Welfare of McDaniel, 64 Wn.2d 273, 275, 391 P.2d 191 (1964). Prejudice is deemed established and the judge loses all jurisdiction over the case. Cockrell, 102 Wn.2d at 565.

We must decide whether the improper denial of an affidavit of prejudice results in mandatory reversal for a new trial or whether the outcome depends upon the degree of prejudice to the party whose affidavit of prejudice was improperly denied. No published case in Washington has considered whether reversal is required under these factual circumstances—where a judge failed to recuse after incorrectly denying an affidavit of prejudice, but a different judge presided over the actual trial. However, one Washington Supreme Court case suggests when a trial judge makes a ruling even after he should have recused because of a timely filed affidavit of prejudice, reversal is not necessarily required. See State ex rel. LaMon v. Town of Westport, 73 Wn.2d 255, 261, 438 P.2d 200 (1968), overruled on other grounds by Cole v. Webster, 103 Wn.2d 280, 692 P.2d 799 (1984).

14

In LaMon, two town voters filed a petition to recall the mayor of the town, because he committed acts of malfeasance while in office. Id. at 256. One of the charges against the mayor was that he appointed Tony McClendon as town clerk when the mayor should have known that McClendon was unqualified. Id. McClendon was named as a party in the action. Id. at 260. The trial court found that some of the charges against the mayor were legally sufficient to invoke the provisions of the recall statute. Id. at 257-58.

The town appealed the trial court's decision. Id. at 258. The town made several arguments on appeal, but one involved the fact that the court made a ruling after McClendon timely filed an affidavit of prejudice. Id. at 259-60. At a hearing, the judge noted that McClendon filed an affidavit of prejudice. Id. at 260. Lawyers for both the voters and the town explained to the court that although McClendon was a named party to the action, he was never served. Id. at 260-61. And, that although he filed an affidavit of prejudice, he was not a proper party to the action. See id. at 260. Consequently, counsel for the voters moved to dismiss him from the action. Id. The judge granted the attorney's motion to dismiss, reasoning that McClendon was not a proper party. Id. And, the judge instructed the parties to proceed. Id.

On appeal, the town argued that it was error for the trial court to try the cause, because the filing of the affidavit of prejudice automatically divests the trial court of jurisdiction. Id. The LaMon court reasoned that although McClendon was erroneously named and although he was never served with process, his voluntary

physical presence in the courtroom vested the trial court with in personam jurisdiction over his person. Id. at 261. It noted that McClendon was entitled to challenge the impartiality of a judge who might be called upon to make a ruling as to his status in the litigation. Id. The court reasoned that the fact that the trial court may have granted what McClendon desired does not retroactively undo the error. Id. The LaMon court concluded that because the trial court's ruling on the voters' motion to dismiss McClendon occurred after the affidavit of prejudice had been properly filed, the trial court's ruling was in contravention of RCW 4.12.040 and RCW 4.12.050. Id.

But, the LaMon court continued, "It is not every error that is reversible error, however." Id. It noted that McClendon's dismissal from the action was concurred in, or at least acquiesced in, by the town. Id. The town agreed in open court that McClendon was an improper party and did not object either when McClendon was dismissed from the action or when the trial court proceeded to hear the cause on the merits. Id. Therefore, it concluded that because the town did not object below, reversal was inappropriate under the circumstances. See id. at 761-62.

McClendon was the party wronged by the judge making a ruling after his timely filing of an affidavit of prejudice. But, the subsequent ruling on the motion to dismiss provided similar relief in that he was not tried before that judge. Although he was the wronged party in the trial court, on appeal he was not the party who sought reversal based on the wrongful denial of his relief—the town did. Although factually distinguishable from Lile's case, LaMon stands for the

16

proposition that not every ruling made after the timely filing of an affidavit of prejudice automatically constitutes reversible error. With this idea in mind, we next consider whether Judge Uhrig's actions after Lile timely filed the affidavit of prejudice constituted reversible error under these circumstances.

Judge Uhrig took three actions in Lile's case after denying the affidavit of prejudice: (1) He declined to set another date for trial until a firm date could be set to accommodate the necessary witnesses,[6] (2) he denied Lile's motion to sever,[7] and (3) he entered an agreed order resetting the trial date after there was no judge available to commence the trial.[8] Judge Garrett presided over the remainder of the proceedings.

Lile argues only that Judge Uhrig's ruling on his motion to sever was improperly made after the denial of the affidavit of prejudice. He correctly asserts

_____

[6] Lile filed a motion to continue the February 10 trial date. After much discussion about calendaring and witness logistics, Judge Uhrig declined to set another date for trial until a firm date could be set to accommodate the necessary witnesses. Therefore, Judge Uhrig did not make a ruling at this point, much less a ruling involving the exercise of discretion. See Guajardo, 50 Wn. App. at 21 (stating that a judge does not exercise his or her discretion when finding no need to rule on a motion). Moreover, Lile does not argue that his trial was affected by Judge Uhrig's inaction on his initial motion to continue.

[7] Lile's motion to sever counts requested that the court order two separate trials. Lile argued that the first trial should govern the alleged second degree assault of Millman and the alleged fourth degree assault of Rowles. He asserted that the second, separate trial should encompass the alleged third degree assault of Officer Woodward and the resisting arrest charge. After hearing argument from the parties, Judge Uhrig denied Lile's motion to sever. The court filed an order denying Lile's motion to sever and an order denying Lile's motion to reconsider the ruling on the severance motion on February 21

[8] On February 18, when trial was to commence, no judge was available to preside over the trial. Judge Uhrig continued the case by agreement of the parties until March 3. Lile does not argue that his trial was affected by Judge Uhrig's entry of the agreed order continuing the trial date.

17

that Judge Uhrig had no authority to rule on the motion and that the ruling on the motion is void. Lile was prejudiced, because prejudice is presumed from the fact the affidavit of prejudice is filed. But, Lile also identifies how he believed he was actually prejudiced by what occurred after the affidavit was not honored: he might have prevailed on his motion to sever had another judge considered it and the denial of the motion to sever impacted the trial.

However, Lile did have an opportunity to have another judge rule on the motion. CrR 4.4(a)(2) states that if a defendant's pretrial motion for severance was overruled, he or she may renew the motion on the same ground before or at the close of all the evidence. Thus, pursuant to CrR 4.4(a)(2), Lile had an opportunity to renew the motion before Judge Garrett at the start of trial or any time before or at the close of all of the evidence. Id. Lile did not renew his motion to sever at any point. In fact, by failing to renew his motion to sever before the close of trial, Lile waived the issue of severance on the merits and cannot now raise it on appeal. CrR 4.4(a)(2); State v. Bryant, 89 Wn. App. 857, 864-65, 950 P.2d 1004 (1998). Thus, it was Lile's failure to renew the motion to sever that foreclosed his opportunity to have another judge hear his motion to sever, not that Judge Uhrig made a ruling on the motion after he was divested of authority to do so.

On these facts, the ruling by Judge Uhrig on the motion to sever after Lile filed his affidavit of prejudice, while without authority, had no effect on the outcome of the trial beyond a reasonable doubt. We conclude the error does not constitute reversible error.

## II. Domestic Violence Evidence

Lile argues that the trial court erred when it refused to permit evidence of Rowles's previous orders of adjudication for domestic violence after Rowles testified on cross-examination that he was not a "fighting person."

During cross-examination, Rowles testified that even though Lile was exchanging profanities with Powell on the night of the incident, he was not too concerned. Rowles testified that words do not hurt people and because he is not a "fighting guy" he lets things "roll off my chest." And, when asked whether he was punching people back during the fight, Rowles responded, "I didn't, I'm not a fighter. I didn't want to be a fighter."

Outside of the presence of the jury, Lile argued that these statements gave the impression that Rowles is a man of peace and that Rowles's testimony opened the door for the admission of evidence that Rowles had harassed an ex-girlfriend.[9] He argued that the harassment evidence constituted fighting and that he should be permitted to draw the harassment evidence out on cross-examination. Lile clarified that he was not arguing that the evidence was admissible as evidence of a common scheme or plan, but rather as impeachment evidence, because Rowles opened the door with his statements. Lile offered exhibit 21—a petition for order

---

[9] Before trial began, Lile filed an ER 404(b) motion to admit evidence of "prior assaultive or harassment acts" by Rowles involving stalking and harassment, of previous ex-girlfriends and an incident of assault involving one of them. The trial court denied Lile's ER 404(b) motion pretrial, reasoning that the events involving Lile and his ex-girlfriends were not sufficiently similar or relevant to the situation here.

of protection based on an assault incident against one of Rowles's ex-girlfriends and the order of protection entered by the court.

The incident of assault involved a time when Rowles was mad at his then-girlfriend, because someone had texted her, and she would not give him her phone. Rowles allegedly grabbed her arms and wrists, held her on the bed, and prevented her from getting away. Eventually she fell off the bed and hurt her neck. She also stated that Rowles said he would "beat the asses" of two men at her workplace, because she talked to them.

The evidence shows that these instances transpired because of jealousy or because the women had ended the relationship with Rowles. While the evidence suggests that Rowles may be abusive and possessive in romantic relationships, nothing in the evidence indicates that Rowles punched his girlfriends or that he ever fought with a third party stranger.

A statement in one of the petitions for an order of protection indicated that Rowles threatened to beat two men, but there is no evidence that ever occurred. And, that threat stemmed from jealousy in his romantic relationship. After reviewing the court record of Rowles's alleged assault of his ex-girlfriend, the trial court specifically noted that the allegations involving the assault in the petition for an order of protection did not accuse Rowles of fighting. The trial court found that the assault allegations listed in the petition for the order of protection against Rowles were not sufficiently similar to be used to impeach Rowles.

On appeal, Lile argues that Rowles opened the door to general impeachment by cross-examination about the domestic violence adjudications when he professed that he was not a fighting person. He argues the critical fact for the jury to decide was whether Lile or Rowles started the fight. He argues the trial court denied Lile key evidence challenging the credibility of Rowles's assertion that he was not the initial aggressor in the fight. Lile asserts that evidence impeaching Rowles is critical, because this case was a credibility contest—Rowles and Millman versus Lile and his companions. Lile relies upon State v. York, 28 Wn. App. 33, 36-37, 621 P.2d 784 (1980), which discusses the admission of evidence under ER 608(b) and State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969) for the proposition that challenged evidence may be allowed in because of an "open door."[10]

ER 608 provides that specific instances of a witness's conduct, introduced for the purpose of attacking his or her credibility, may not be proved by extrinsic evidence. But, they may be inquired into on cross-examination in the discretion of the court, if probative of truthfulness or untruthfulness. This court reviews the trial court's decision to admit or exclude evidence for abuse of discretion. State v. Thomas, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). In exercising its discretion, the

---

[10] When a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or redirect examination within the scope of the examination in which the subject matter was first introduced. Gefeller, 76 Wn.2d at 455. The State argues the door was not opened because Lile first elicited Rowles's testimony on cross-examination of the State's witness—the State did not elicit the testimony on direct examination. The trial court never made an explicit ruling about whether Rowles opened the door to any evidence when he testified that he was not a fighter.

21

trial court may consider whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial. State v. O'Connor, 155 Wn.2d 335, 349, 119 P.3d 806 (2005). Relevant evidence is evidence that tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401.

Lile contends that the proffered evidence was proper, essential to the defense, and admissible under York. In York, a drug case, York was convicted primarily based on the testimony of an undercover investigator for the sheriff's department, who testified to buying two bags of marijuana from York. 28 Wn. App. at 34. On direct examination, the investigator testified about his background, his military service, and his past experience performing undercover work. Id. The defense sought to cross-examine the investigator with evidence that he had been fired from a position with another law enforcement agency, because of irregularities in his paperwork procedures and unsuitability for the job. Id. But, the trial court granted the State's motion in limine to exclude the evidence as a collateral matter. Id. Through other witnesses, the defense provided York with an alibi. Id. at 34-35. And, it sought to show that the investigator had fabricated the drug buy, because he needed the money and was being paid for each successful drug buy. Id.

The York court concluded that the trial court abused its discretion in excluding the evidence, because the investigator was the only witness to have

seen York sell the drugs and because his unsullied background and credibility were stressed by the prosecution. Id. at 35-36. It noted that the investigator's credibility was not a collateral matter, but was instead the very essence of the defense. Id. at 36.

The alleged misconduct of the testifying witness in York—the irregularities in the investigator's paperwork procedures causing him to lose a previous job—was itself an act calling the investigator's credibility into question. And, that the investigator had been fired for fabricating paperwork was probative of whether he was fabricating his testimony related to the drug buy.

Here, unlike the evidence introduced in York, evidence about whether Rowles is a fighter is not itself probative of his truthfulness.[11] But, Rowles's testimony did directly contradict Lile's testimony. Rowles testified that Lile was the initial aggressor as between the two men. He also testified that he did not punch back during the fight, because he was not a fighter and did not want to be a fighter.

Rowles did not testify that he was a peaceful person. That was Lile's characterization of his testimony. Nor did he testify that he had never been aggressive or threatening, only that he was not a fighter. Therefore, Rowles's testimony would not have opened the door to evidence that Rowles is generally not peaceful or that Rowles is generally aggressive. It would have opened the

___

[11] It is worth noting that York is also distinguishable, because the court emphasized that the investigator was the only individual who saw the drug buy and that he was one of the most important witnesses against York. 28 Wn. App. 34, 37. Here, by contrast, Millman saw the entire fight and testified that Lile was the initial aggressor as between Rowles and Lile. And, unlike in York, Rowles's background was not painted as pristine nor did the State emphasize his credibility. In fact, here, the defense was able to impeach Rowles on other issues.

door to only evidence that Rowles is a fighter or was the initial aggressor in the fight—evidence directly contradicting Rowles's testimony and challenging his credibility.

Rowles's behavior leading to the entry of the protection orders was factually different than the behavior involved with being the aggressor in a fight with a male stranger. Lile could not offer the evidence to establish Rowles had actually thrown a punch or had been the first aggressor. Thus, it was not an abuse of discretion to conclude that the proffered evidence was not probative of whether Rowles was a fighter. Nor would it challenge Rowles's stated reason for not punching back during the fight. If it was not probative of whether he was a fighter, it would not undermine his credibility.

We hold that the trial court did not abuse its discretion in excluding this evidence.

III.   Warrior Evidence

Lile next contends that the trial court erred when it admitted Lile's testimony about whether he considered himself a warrior and when it required him to answer the State's questions about the meaning of his tattoo.

Lile testified at trial. During direct examination, Lile testified that he hit someone during the fight, because that person was coming toward him in an aggressive manner, and he was very frightened. He further testified that he felt very threatened and scared for his life.

During cross-examination the State began by asking Lile questions about his job in the Navy. The State sought and received confirmation that Lile went through boot camp which taught him to function in stressful combat situations and that Lile is trained to fight in naval wars. The State then turned to the night in question. Lile testified that the males in Lile's group outnumbered the males in Rowles's group. Lile testified that during the fight he was not angry, but was very scared.

After some additional questioning, the State returned to asking questions about Lile's naval experiences. The State asked Lile whether in the Navy he has to make decisions in potentially hostile environments. Lile responded that he does. And, Lile testified that he is proud of his ability to function in the military. Next, the State asked Lile whether he is proud of the fact that he is a warrior. Lile objected to the question based on the "implication," and the trial court sustained the objection. The State then asked Lile whether he was a person who gets scared easily at the prospect of a fight. Lile objected, "I'd object, it calls for, refers to matters that [it] should not, if they exist." The trial court overruled the objection. Over objection, Lile responded that he has not been in many fights, that he was scared during the fight in question, and that he does scare easily at the thought of a fight. The State followed up by confirming that Lile has not been in a lot of fights. Lile objected, "What does this have to do with it?" The trial court agreed with Lile and noted that Lile could answer the question, but then the State needed to move on. Lile testified that he had not been in many fights.

Then, the State asked Lile whether one of the words in the tattoo on Lile's back was Latin for "warrior." Lile objected based on relevance and probative value. The trial court sustained the objection.

After some additional unrelated questioning, outside of the presence of the jury, the State explained to the court that it wished to pursue the line of questioning about whether Lile considers himself a warrior in order to impeach Lile's statement that he was afraid during the fight ("Well if he self identifies as a warrior it's a lot less likely he got afraid of the locals and the investment banker than if[] he's an accountant or something."). The trial court stated that it did not believe it was appropriate to question Lile about what a warrior is, nor is it appropriate for the State to make a connection between a warrior in the armed forces and a person who is an assaulter. The State noted that it was not going to say that Lile is an assaulter, but that he is a person who knows how to handle himself in a fight.

After further discussion, the trial court informed the State that it could ask the question about whether Lile considers himself a warrior and if Lile said no, the State could ask about the meaning of the tattoo on Lile's back. The trial court was apparently persuaded by the State's argument that it wanted to rebut Lile's claim that he was overcome with fear during the incident.

After the trial court made its ruling, Lile argued that "warrior" in this context is a volatile term and that allowing questioning about whether Lile is a warrior in this context impugns everybody in the military. The court reiterated its ruling and stated that it did not believe that the word "warrior" when applied to a person in the

armed services is prejudicial or a pejorative term. Lile noted that the State was improperly making a connection between Lile being a warrior and being more likely to have started the fight. The court noted, "You can make that connection in argument, I've ruled on what facts are permissible to support that connection. And, of course, you'll have the opportunity for redirect."

The following questioning took place in the presence of the jury:

Q:    (BY MR. HULBERT) Mr. Lile, you're a warrior, aren't you?

A:    No, sir.

Q:    You have a word, you have the Latin phrase for eternal warrior tattooed on your back?

> MR. JOHNSTON: I object, he says he's not a warrior.
>
> THE COURT: All right. The question will be permitted.
>
> MR. LILE: Yes, sir. I've got the words aetermus pugnator tattooed across my upper back. In Latin that means eternal warrior. . . .

. . . .

> . . . . I got the tattoo because of my religious beliefs. I do believe that I will be an eternal warrior for God and that I'm to carry out his works whether I fall short or not.

A party may assign error to the appellate court on only the specific ground of evidentiary objection made at trial. State v. Frederick, 45 Wn. App. 916, 922, 729 P.2d 56 (1986). When the State asked Lile about his tattoo, Lile objected based on relevance and probative value. Up to that point, Lile had not stated a specific basis for the objection. On appeal, ER 404(b) is the only evidentiary rule or legal authority Lile cites. Lile clearly did not object on this basis below. The

remainder of Lile's evidentiary arguments are wholly unsupported.[12] As such, we decline to consider them. Frederick, 45 Wn. App. at 922.; RAP 10.3(a)(6) (brief must contain arguments together with citations to legal authority); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 547 (1992) (stating that arguments not supported by authority will not be considered).

IV.    Impugning Defense Counsel

Lile argues that the trial court erred when it allowed the prosecution to undermine the integrity of defense counsel by suggesting that he tampered with the defense witnesses.

During trial, the State called Detective Tim Ferguson to testify. Throughout direct examination, the State elicited testimony insinuating that Johnston had instructed Sean Duff, a defense witness who was in Lile's group on the night of the fight, not to meet with Detective Ferguson. The State did so by eliciting testimony that Duff had agreed to meet with Detective Ferguson on a specific day, that Duff canceled the meeting, and that Detective Ferguson had informed Duff that he needed to meet with him regardless of what Johnston had told him. Duff testified for the defense.

---

[12] Lile also argues that the actions of the State in painting Lile as a "warrior" was misconduct and improper cross-examination. Lile provides no authority or additional argument to support this assertion. As such, we decline to address whether the State's cross-examination of Lile constituted prosecutorial misconduct. RAP 10.3(a)(6) (brief must contain arguments together with citations to legal authority); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (stating that arguments not supported by authority will not be considered).

The State probed this line of questioning further during its cross-examination of Duff. Lile objected, and the jury was excused. The State explained that it sought to elicit testimony from Duff about why he had canceled the meeting with Detective Ferguson. It sought to do so both because it would rebut any of Lile's allegations that Detective Ferguson's investigation of the incident was deficient and because Duff previously provided two different reasons for canceling the meeting. Outside the presence of the jury, the trial court ruled that the State could ask Duff whether he gave two different reasons for canceling the meeting without asking Duff why he did so. The court also noted that it was permissible for the State to draw out testimony that Duff met with Johnston in the company of other witnesses and that they discussed the facts of the incident together.

After the jury returned, the testimony proceeded as follows:

[BY MR. HULBERT]: So you had spoken to Detective Ferguson on the phone, indicated that you would want to come in and make a statement to him; is that correct?

A.   Yes.

Q.   And then you indicated to him that you were on your way to see Mr. Johnston; is that correct?

A.   Yes.

Q.   And then after you met with -- well, strike that. When you met with Mr. Johnston, Allen Owens was there as well, correct?

A.   Yes.

Q.   And was Mr. Lile there?

A.   No.

Q.    So you, after meeting with Mr. Johnston you changed your mind about wanting to meet with Detective Ferguson; is that correct?

MR. JOHNSTON: I'm objecting to, Your Honor, to the inquiry.

. . . .

. . . . he's doing the same thing the Court prevented him --

THE COURT: I am going to permit the question because as I understand it this is the chronology in time in which the events occurred, but I'm also going to instruct the jury that's simply what this is, a discussion of the chronology in time when the events occurred and you're not to infer anything beyond the testimony, you're not to infer any causal connection that you don't hear testimony or other evidence about. . .

Q:    (BY MR. HULBERT): So it was after, at some point after speaking with Mr. Johnston you changed your mind about wanting to see Detective Ferguson; is that right?

A:    It wasn't that I changed my mind, there was a set time we were supposed to meet and that time changed and I had to get back to work so that's the reason why.

Then, during the State's rebuttal during closing argument, the State pointed out that the defense witnesses all used a particular phrase to describe the physical contact between Lile and Rowles on the night of the incident: "shoulder check." The State then opined, "So one of them did [use the phrase], one of them didn't. And then the next they go and see Mr. Johnston together, and then in a subsequent interview all of a sudden [the one who was not using the phrase] is using the term shoulder check." Lile objected arguing that "[i]t sounded improper." The court responded, "I'll simply instruct the jury that witnesses and parties meet with lawyers frequently in the development of a case so the fact that a witness or lawyer met

30

with another lawyer is not to be taken by you to make an adverse inference against anybody."

On appeal, Lile argues that the State's actions constituted disparagement of defense counsel, which is a violation of the Sixth Amendment. He argues that none of the questioning and argument impugning the integrity and professionalism of defense counsel should have been allowed in the trial.

A prosecutor must not impugn the role or integrity of defense counsel. State v. Lindsay, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible. Id.

Lile relies upon only United States v. McDonald, 620 F.2d 559 (5th Cir. 1980) to support all of his assertions. In McDonald, the prosecutor attempted to establish that McDonald had destroyed evidence of a counterfeiting operation while agents waited four hours for a search warrant for McDonald's house. Id. at 561. The prosecution deliberately elicited testimony that McDonald's attorney was present at the time the warrant was executed. Id. at 561-62. The prosecutor used that testimony during rebuttal in closing argument to suggest that because the defendant had several hours' notice before the house was searched, and because his attorney was present at the scene the defendant would have had sufficient time to dispose of any evidence. Id. at 562.

On appeal, McDonald argued that the prosecutor's statements violated McDonald's right to counsel. Id. The McDonald court concluded that the purpose

of the reference to the attorney's presence at the scene was to cause the jury to infer that McDonald was guilty. Id. at 564. It stated that the reference penalized McDonald for exercising his Sixth Amendment right to counsel. Id. The McDonald court held that it is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel. Id.

Here, the questioning, testimony, and argument did not implicate Lile's Sixth Amendment right to counsel or imply that by having exercised that right Lile was guilty. Rather, the evidence was used to imply that the main witnesses' credibility was questionable, because they had met with each other in Johnston's presence and discussed the events of the night before giving their statements to Detective Ferguson. Thus, McDonald is distinguishable. Moreover, the State never made a direct assertion explicitly impugning Johnston. And, that Johnston coached the defense witnesses is not a necessary inference, but a possible inference. Lile provides no authority for the proposition that it is error for the State to create suggestive point-in-time references that calls a witness's credibility into question.

Lile argues that the questioning and argument can be said to be improperly implying that Johnston coached the witnesses' testimony or instructed the witnesses not to meet with Detective Ferguson. However, the trial court twice instructed the jury not to draw these inferences or draw causal connections not supported by the evidence. A curative instruction may be used to alleviate any prejudicial effect of an attack on defense counsel. See State v. Thorgerson, 172 Wn.2d 438, 452, 258 P.3d 43 (2011) (concluding that a curative instruction would

have alleviated any prejudicial effect of a prosecutor's disparaging remarks about defense counsel). Therefore, we hold that the trial court did not violate Lile's Sixth Amendment right.

V.   Closing Argument

At trial, Owens's testimony was presented via a video deposition.[13] During closing argument, the State argued, "And Allen Owens also said he wouldn't have thrown the punch if he were in Mr. Lile's shoes." The State concedes in its brief that the prosecutor's reference to Owens's testimony during closing argument was error, because that testimony was not heard by the jury. But, it notes that if Lile is asserting that the prosecutor's reference in closing argument was prosecutorial error, he should have presented argument and citation to authority. Lile did not file a reply brief clarifying his argument. Because Lile presented no argument or authority relating to prosecutorial misconduct in either his opening brief or his letter to the court, we decline to consider that issue. RAP 10.3(a)(6); McKee v. Am. Home Prods., Corp, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989) (stating that issues not supported by argument and citation to authority will not be considered on appeal).

---

[13] In Lile's opening brief, he argued that the trial court erred when it did not redact an excerpt from Owens's video deposition discussing whether Owens would have thrown a punch like Lile did in a similar situation. He argued that it misrepresented self-defense law. But, Lile later wrote a letter to this court conceding that the portion of Owens's deposition testimony that he quoted in his opening brief was not actually presented to the jury. However, he noted that the reference to that testimony was still presented to the jury during the State's closing argument.

VI.   Self Defense Instruction

Lile argues that the trial court erred when it denied him a self-defense instruction for the third degree assault charge against a police officer.

Below, Lile proposed a self-defense instruction for the assault in the third degree charge—the assault of Officer Woodward.  His proposed self-defense instruction was based on *Washington Pattern Jury Instructions: Criminal* 17.02, at 253 (3d ed. 2008) (WPIC).  WPIC 17.02 states in part, "The [use of] force upon or toward the person of another is lawful when [used] [by a person who reasonably believes that [he] is about to be injured] in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary." (Alterations in original.)  Lile proposed the same self-defense instruction for the assault in the second degree and assault in the fourth degree charges.  Below, Lile referred to this instruction as the "norm" self-defense instruction.  We will refer to this instruction as the general self-defense instruction.

The State argued that Lile's proposed self-defense instruction, the general self-defense instruction, is not available when the assault is alleged to have been against a law enforcement officer.  The trial court denied Lile's request for the general self-defense instruction for that charge.  The self-defense instruction provided to the jury specifically stated,

> This defense does not apply if the person upon whom the force was used was a law enforcement officer performing his or her official duties.  Therefore, this instruction applies to Counts I (Assault in the Second Degree) and II (Assault in the Fourth Degree).  This instruction does not apply to Counts III (Assault in the Third Degree) or IV (Resisting Arrest).

34

A defendant in a criminal case is entitled to have the jury fully instructed on the defense theory of the case. State v. Staley, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). However, a defendant is not entitled to an instruction which inaccurately represents the law or for which there is no evidentiary support. Id. An appellate court reviews a trial court's choice of jury instructions for an abuse of discretion. State v. Hathaway, 161 Wn. App. 634, 647, 251 P.3d 253 (2011).

Lile first argues that he was entitled to the self-defense instruction, because he did not know that Officer Woodward was a police officer. He argues that the right of self-defense and the right to resist an arrest is based on the clear criterion that the defendant knew that he was "dealing with a law enforcement officer." State v. Bradley, 96 Wn. App. 678, 683, 980 P.2d 235 (1999), aff'd, 141 Wn.2d 731, 10 P.3d 358 (2000) He relies on the Bradley court's language that an arrestee's resistance of excessive force by a known police officer, effecting a lawful arrest, is justified only if he was actually about be to be seriously injured. Id. But, the Bradley court drew that language from 11 WPIC 17.02.01, at 257, a jury instruction specifically addressing an arrestee resisting detention.[14] Bradley, 96 Wn. App. at 681-82. The Bradley court was not considering the applicability of the general self-

---

[14] WPIC 17.02.01 states:

A person may [use] force [to resist] an arrest [by someone known by the person to be a [police] officer] only if the person being arrested is in actual and imminent danger of serious injury from an officer's use of excessive force. The person may employ such force and means as a reasonably prudent person would use under the same or similar circumstances.

(Alterations in original.)

35

defense instruction to an assault against a police officer charge. See Id. Lile did not request this jury instruction below.

Moreover, the court in State v. Belleman, 70 Wn. App. 778, 782, 856 P.2d 403 (1993) considered and rejected Lile's argument. In Belleman, the defendant proposed several self-defense jury instructions after he struck a police officer during a struggle while the officer was attempting to conduct a lawful arrest. Id. at 779-80, 782. The defendant argued that he did not know the man was a police officer and said that he was fighting back to protect himself. Id. at 780. The trial court refused to give the self-defense instructions, holding that self-defense instructions do not apply to assaults committed in the course of lawful apprehensions. Id.

On appeal, the Belleman court concluded that where an arrest is lawful, but the defendant does not know that he is being lawfully arrested, he does not have a right to self-defense nor to such an instruction. Id. at 782. The court reasoned that it makes no difference that the defendant did not know the officer was a police officer, because a defendant can be charged with third degree assault against non-police officers whose apprehension of the defendant is "lawful." Id. at 782. The court opined that the essential issue is thus whether the arrest was lawful, not whether the defendant knew the police officer was an officer. Id. at 782-83. The Belleman court noted that the defendant did not assert that his arrest was unlawful, nor could he because the facts suggested that he committed an offense. Id. Similarly, here, Lile does not assert that his arrest was unlawful. He asserts only

that he is entitled to the self-defense instruction, because he did not know Officer Woodward was an officer.[15] Therefore, under Belleman, even if Lile did not know that Officer Woodward was a police officer, he does not have a right to the self-defense instruction.

Alternatively, Lile argues that he was entitled to the self-defense instruction, because an arrestee who is being choked may resist and raise self-defense under State v. Valentine, 132 Wn.2d 1, 21, 935 P.2d 1294 (1997). In Valentine, the court considered whether the trial court erred when it provided the jury with a specific self-defense instruction related to an unlawful arrest. Id. at 6. The instruction stated that a person unlawfully arrested by an officer may resist the arrest if the means used to resist are reasonable and proportioned to the injury attempted upon the arrestee, but the use of force to prevent an unlawful arrest which threatens only a loss of freedom is not reasonable. Id. The defendant argued that the trial court erred when it instructed the jury that a person may not use force to resist an unlawful arrest which threatens only a loss of freedom. Id.

While the Valentine court ultimately considered Valentine's argument, it first noted that it was unnecessary for it to decide the validity of the jury instruction, because Valentine never claimed that his arrest was unlawful. Id. at 7. Lile did not propose a jury instruction similar to the one in Valentine. Nor does Lile argue that his arrest was unlawful. Therefore, Lile's reliance on Valentine is misplaced.

---

[15] The record is replete with evidence that Officer Woodward, whose marked police car was nearby with the lights on and who was wearing his uniform, had announced himself to Lile as a police officer.

The trial court did not abuse its discretion when it denied Lile's request for the general self-defense jury instruction for the assault of Officer Woodward.

VII. Cumulative Error

Finally, Lile argues that the trial court erred when it denied Lile's motion for a new trial.[16] He argues that he is entitled to a new trial, because of the cumulative error doctrine. The cumulative error doctrine applies only when there have been several trial errors that standing alone may not be sufficient to justify reversal, but when combined may deny a defendant a fair trial. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Here, although we hold the trial court erred when it denied Lile's affidavit of prejudice as untimely, Lile failed to show how that error denied him a fair trial. We conclude that the cumulative error doctrine does not apply here.

We affirm.

WE CONCUR:

---

[16] Lile filed a motion for a new trial. In his motion for a new trial, he argued a new trial was warranted based primarily upon the warrior evidence, the exclusion of the evidence of Rowles's domestic violence orders of adjudication, and Owens's testimony about whether he would have thrown a punch in the same situation.