IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47030-6-II |
| Respondent, | |
| v. | ORDER AMENDING OPINION AND DENYING MOTIONS FOR RECONSIDERATION |
| CHARLES LONGSHORE, III, | |
| Appellant. | |

The appellant, Charles Longshore, III, and the respondent, the State of Washington, each filed a motion for reconsideration of our unpublished opinion filed on December 21, 2016. After consideration, we deny both motions for reconsideration but we amend the opinion as follows:

On page 11 of the slip opinion, insert a footnote at the end of the last sentence in the second paragraph. The footnote reads:

Because we reverse, we will address only the issues that may be dispositive of this case.

**IT IS SO ORDERED.**

**DATED this 14 day of March, 2017.**

_____
Lee, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47030-6-II |
| Respondent, | |
| v. | |
| CHARLES LONGSHORE, III, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Charles Longshore III was convicted of two counts of aggravated first degree murder. He appeals, arguing that (1) the State committed prosecutorial misconduct by knowingly soliciting false testimony, and (2) the trial court erred by (a) giving an instruction that defined "accomplice" because there was no accomplice liability alleged, and (b) denying his motion to dismiss based on the State's failure to preserve evidence. Longshore also raises a number of arguments in a statement of additional grounds (SAG). We hold that the trial court improperly instructed the jury on accomplice liability and that the error was not harmless. With regard to issues raised in the SAG that may be dispositive or may arise on remand, we hold that sufficient evidence supports the jury's finding of premeditation and the aggravating circumstances; the trial court did not err in admitting Longshore's May 28 and June 4 statements; the trial court erred in admitting Longshore's statements made on June 1 after he unequivocally asserted his right to remain silent; and Longshore's claim that he was misadvised about his right to counsel fails. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

No. 47030-6-II

FACTS

A.  THE CRIME

Robert "Bobby" Raphael and Kristina Selwyn lived at 211 West Harvard, which was separated by a dirt alley from a mobile home located at 213 West Harvard. Raphael had a camper trailer (the camper) parked in the alley next to the mobile home's driveway.

Raphael sold methamphetamine. Both Raphael and Selwyn were regular consumers of methamphetamine.

Longshore and Raphael first met in late May 2012. On May 27, Longshore arrived at Raphael's house hoping that Raphael could help him earn money. Raphael offered to have Longshore sell a gun for him, with Longshore keeping some of the proceeds. Longshore agreed and left Raphael's house with the gun.

Longshore was unable to sell the gun and returned later that day. When Longshore returned with the gun, it was loaded, and he and Raphael test fired it. Raphael and Longshore then went into the camper, and Raphael told Longshore he could put the gun in the camper's kitchen cupboard.

Someone in the mobile home called Raphael and asked him to come over to sell methamphetamine. Raphael and Longshore went to the mobile home. Someone told Raphael that Anitrea "Roxie" Taber was in the mobile home, and Raphael commented to Longshore that Taber owed him money.

Raphael and Longshore went into the mobile home to weigh the methamphetamine for the sale. Taber and Tyler Drake were seated at the kitchen table. Raphael quietly identified Taber to

2

Longshore because "if [Longshore] was going to do any collecting for [him] that, you know, that would be the person to collect from." 11 Verbatim Report of Proceedings (VRP) at 1825.

Raphael asked Taber to pay him. Taber told Raphael that he was not a priority, and she would not pay him. Longshore and Raphael left the mobile home.

After Raphael and Longshore left the mobile home, Selwyn saw Longshore in the camper. Selwyn walked into the camper, saw Longshore holding Raphael's gun.

Selwyn then went to talk with Raphael. Raphael told Selwyn that Taber refused to pay him, and Selwyn threatened to beat up Taber. Selwyn and Raphael went to the mobile home to confront Taber. On the way, Selwyn saw Longshore standing outside the mobile home with Raphael's gun. Selwyn and Longshore stood nearby in the yard of the mobile home while Raphael went to the door of the mobile home.

Taber and Drake were in the kitchen of the mobile home, sitting at the table. Raphael again asked Taber for money, and she again refused to pay him. At that point, Longshore walked past Raphael into the kitchen and began yelling at Taber for payment. While yelling at her, Longshore drew the gun and struck Taber in the head. When Longshore struck Taber, the gun accidentally discharged. Taber did not react when she was struck in the head, and there was no indication that she was shot. Longshore then "took a little step back and pointed it at her and shot her" in the head. 11 VRP at 1836. After that, Longshore turned and shot Drake. Raphael asked Longshore what he was doing, and Longshore said, "[N]o witnesses." 11 VRP at 1839. Both men left the scene.

Around 1:00 a.m. on May 28, dispatch received a 911 call reporting gunshots heard near the mobile home. Law enforcement went to the scene and, as they approached the property,

Sergeant Harry Heldreth encountered Raphael, who reported that he called 911. Both Raphael and Selwyn told Sergeant Heldreth that they did not see anyone leave the mobile home and no cars left the property. Officers found two deceased adults in the kitchen of the mobile home. Both died from gunshot wounds.

While talking to neighbors, police stopped a vehicle near the scene. Longshore was in the back seat of the vehicle. Longshore was considered a possible witness at that point by the police. After talking with Detective Calvin Moran, Longshore left the scene. Longshore gave statements to police on May 28, June 1, and June 4.

B.     PROCEDURAL FACTS

After further investigation, Longshore was arrested and charged with two counts of aggravated first degree murder.[1] The State alleged that (1) there was more than one person murdered and the murders were part of a common scheme or plan or the result of a single act of the person, and (2) the murders were committed to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime.[2]

The State also charged Raphael with two counts of first degree murder with firearm enhancements, and one count of first degree rendering criminal assistance.[3] In exchange for his testimony against Longshore, the State agreed to allow Raphael to plead guilty to second degree

---

[1] RCW 9A.32.030(1)(a); RCW 10.95.020.

[2] RCW 10.95.020(9), (10).

[3] RCW 9A.32.030(1)(a), (c); RCW 9.94A.825; RCW 9A.76.070(1); RCW 9A.76.050.

murder, second degree manslaughter, first degree burglary, and first degree extortion, with a recommended sentence of approximately 295 months in prison.

Longshore and Raphael were not charged together, and they were not codefendants. When Raphael was taken to the Mason County Jail after his arrest, his clothing was not placed in evidence and was laundered by the jail.

During jury selection in Longshore's trial, the jury venire was sworn in on the record and in open court. The trial court, noting that the courtroom was not big enough to accommodate the entire jury pool, divided the jury pool into two groups. The trial court distributed juror questionnaires and instructed the jury to complete the questionnaires in the jury room.

Longshore moved to suppress his statements made to police on May 28, June 1, and June 4. The trial court ruled that Longshore's statements on May 28 were admissible because they were not made while in custody. The trial court also ruled that Longshore voluntarily waived his *Miranda*[4] rights on June 1; that when he asked the conversation to be over and signed the final acknowledgment, the interview had terminated; and that he did not unequivocally reassert his right to remain silent.[5] Finally, the trial court ruled that Longshore's June 4 statement was admissible because he had voluntarily waived his *Miranda* rights.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] Detective Rhoades testified that he had Longshore sign a form indicating that he had been advised of his *Miranda* rights and he was willing to give a recorded interview. The same form provides formal requirements for the conclusion of the recorded statement, including a perjury clause.

Longshore moved to dismiss because the State failed to preserve evidence that could be useful to the defense—Raphael's clothing.[6] Longshore argued that the State failed to preserve and consumed material evidence that would either be exculpatory or potentially useful. The trial court ruled that the evidence was within the category of "potentially useful" evidence and that Raphael's clothing had no apparent exculpatory value before the State destroyed the evidence. 4 VRP at 568. And because the evidence was merely "potentially useful," the test was whether the State acted in bad faith. The trial court found that while the jail did not have protocol for preserving evidence for testing, the jail did not have a duty to preserve all evidence. The trial court denied Longshore's motion to dismiss.

C.      TRIAL

The State offered a jury instruction on evaluating the credibility of a witness who is an accomplice, "geared toward" Raphael's testimony.[7] 14 VRP at 2221. Longshore objected to the instruction.

The State argued that Raphael fit the definition of an accomplice because Raphael effectively solicited Longshore to intimidate the first victim to collect debts owed. The State contended that it proposed the instruction out of fairness to Longshore because the instruction "tells the jury almost to be hypercritical of [Raphael's] credibility." 14 VRP at 2221.

---

[6] Longshore also moved to dismiss because the State failed to preserve DNA (deoxyribonucleic acid) evidence from the gun. That issue is not raised in this appeal.

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 184 (3d ed. 2008) (WPIC).

The trial court noted that the instruction was a cautionary instruction and was protective of the defendant. The trial court found that a jury could see Raphael as an accomplice based on the evidence in its entirety and gave the instruction.[8] The trial court also instructed the jury on the definition of an accomplice.[9]

Longshore proposed the following instruction based on a Ninth Circuit model jury instruction:

> Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that the defendant committed the crimes of Aggravated Murder in the First Degree. The defendant must be a

---

[8] The accomplice testimony instruction provided:

> Testimony of an accomplice, given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Clerk's Papers (CP) at 109.

[9] The accomplice definition instruction provided:

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

CP at 110.

> participant and not merely a knowing spectator. The defendant's presence may be considered by the jury along with other evidence in the case.

CP at 216; NINTH CIRCUIT JURY INSTRUCTIONS COMM., MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT 6.10 (2010). Longshore argued that "the purpose of this is to eliminate the situations that while you were there, therefore you are also responsible for what occurred." 14 VRP at 2225. Longshore also argued that his defense theory was that he was merely present and that he was concerned the jury could be confused when presented with the jury instructions regarding accomplices. The State confirmed to the trial court that it was not alleging accomplice liability.

The trial noted that Longshore's proposed Ninth Circuit model jury instruction was not necessary if the State's case was not fully based on the defendant's presence and the jury was instructed on the elements of the crime. The trial court denied Longshore's proposed instruction, finding that it was unnecessary because it would instruct the jury on the elements of the crime, including that first degree murder necessarily involves more than mere presence.

Longshore also proposed an instruction on adverse inferences regarding the destruction of the evidence—Raphael's clothing. The trial court denied Longshore's proposed instruction, finding that it created a mandatory inference, which is generally disfavored.

During deliberations, the jury asked the trial court: "If by definition in [the accomplice definition instruction] someone is determined to meet the criteria of an accomplice would they therefore be guilty of the finding of either 1st or 2nd degree murder?" and "Are we allowed a copy of Washington State law regarding 1st and 2nd degree murder?" Clerk's Papers (CP) at 95. The trial court responded, "You have all the instructions in this case." CP at 95.

The jury found Longshore guilty on both counts of first degree murder, and through special verdicts, found the aggravating circumstances that Longshore committed the murders to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime, and that there was more than one person murdered and the murders were part of a common scheme or plan or the result of a single act of the person. The trial court sentenced Longshore to life in prison without the possibility of parole.

## ANALYSIS

A.     ACCOMPLICE INSTRUCTION

Longshore argues that the trial court erred in giving an accomplice instruction because the evidence did not support a conclusion that Raphael or Longshore acted as accomplices. We agree.

Jury instructions are constitutionally sufficient if they properly inform the jury of the applicable law, are not misleading, and allow the parties to argue their theories of the case. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). We review jury instructions within the context of the instructions as a whole. *State v. Munoz-Rivera*, 190 Wn. App. 870, 882, 361 P.3d 182 (2015). We review a trial court's choice of jury instructions for an abuse of discretion. *State v. Lile*, 193 Wn. App. 179, 211, 373 P.3d 247, *review granted in part*, 186 Wn.2d 1016 (2016).

1.   Abuse of Discretion

A trial court abuses its discretion when the trial court's decision is manifestly unreasonable, or made on untenable grounds or for untenable reasons. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). A decision is made on untenable grounds or for untenable reasons if it is based on facts unsupported in the record or reached by applying the wrong legal standard. *Id.* To determine if the record includes sufficient evidence to support the giving of an instruction, we

review the evidence supporting a proposed jury instruction in the light most favorable to the party that requested the instruction. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The accomplice instruction provided that someone was an accomplice if, in part, he aided, solicited, commanded, encouraged, or requested the commission of *the* crime. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51, at 217 (3d ed. 2008) (WPIC). A person is not an accomplice based on aiding in the commission of *any* crime; rather, an accomplice must have acted with knowledge that his conduct would promote or facilitate *the* crime that is charged. *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000).

Here, the trial court instructed the jury on weighing the testimony of an accomplice and instructed the jury on the definition of an "accomplice." However, there was no evidence that Raphael solicited, commanded, encouraged, requested, or aided Longshore in the killings. Rather, the record shows that Raphael encouraged or aided Longshore to help him collect debts owed to Raphael. Raphael testified that he did not intend for either victim to be hurt or killed. Further, Raphael testified that he "freaked out" when Longshore shot Taber, and asked what he was doing, which allows a reasonable inference that the shooting was unexpected. 11 VRP at 1839. Accordingly, based on Raphael's testimony regarding debt collection, a jury could have found that Raphael encouraged or aided Longshore in *a* crime. But the record does not contain evidence allowing a reasonable inference that Raphael was an accomplice to *the* crime charged—aggravated first degree murder. Therefore, because the record does not support an accomplice liability instruction, the trial court abused its discretion in giving such an instruction.

2.      Not Harmless Error

An erroneous instruction given on behalf of a party in whose favor a verdict is returned is presumed prejudicial unless it affirmatively appears the error was harmless.  *State v. Rice*, 102 Wn.2d 120, 123, 683 P.2d 199 (1984).  An error is harmless only if it appears beyond a reasonable doubt that the error did not contribute to the ultimate verdict.  *State v. Berube*, 150 Wn.2d 498, 505, 79 P.3d 1144 (2003).

Here, the erroneous instruction allowed the jury to consider whether Longshore was guilty of first degree murder through accomplice liability for a crime other than aggravated first degree murder.  The jury's confusion and improper consideration of Longshore's accomplice liability is evidenced by its question during deliberations.  The jury asked the trial court: "If by definition in [the accomplice definition instruction] someone is determined to meet the criteria of an accomplice would they therefore be guilty of the finding of either 1st or 2nd degree murder?"  CP at 95.  Based on the jury's confusion related to the precise risk posed by the erroneous instruction at issue, we are not convinced beyond a reasonable doubt that the erroneous accomplice liability instruction did not contribute to the ultimate verdict.  Therefore, the error is not harmless, and we reverse.

B.      MOTION TO DISMISS BASED ON FAILURE TO PRESERVE EVIDENCE

Longshore argues that the trial court erred by denying his motion to dismiss based on the State's failure to preserve potentially exculpatory evidence on Raphael's clothing.  We disagree.

Due process requires the State to disclose material exculpatory evidence to the defense, as well as a related duty to preserve such evidence for use by the defense.  *State v. Donahue*, 105 Wn. App. 67, 77, 18 P.3d 608 (2001) (citing *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517

(1994)). We review an alleged violation of due process de novo. *State v. Johnston*, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007).

Material exculpatory evidence must possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Wittenbarger*, 124 Wn.2d at 475. But if the evidence is only "potentially useful," due process is not violated unless the defendant can show bad faith on the part of the police. *Id.* at 477. The United States Supreme Court has been unwilling to "'impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.'" *Id.* at 475 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). Potentially useful evidence is that "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011).

Longshore does not argue that Raphael's clothing was material exculpatory evidence. His argument assumes that the evidence is potentially useful. He argues that Raphael's clothing was immediately recognizable as evidence of the crime for which he was arrested, and the police department's failure to have a policy regarding the preservation of evidence constitutes bad faith.

Even if we assume without deciding that the evidence was potentially useful, Longshore has not demonstrated that the police's failure to preserve Raphael's clothing after Raphael was arrested constituted bad faith. And Longshore acknowledges that the jail followed its policy of eventually laundering an inmate's clothing upon arrest. *See State v. Ortiz*, 119 Wn.2d 294, 302, 831 P.2d 1060 (1992) (defendant's semen samples were not suitable for testing due to improper

preservation, but the officers acted in good faith and in accord with their usual practice), *disapproved on other grounds by State v. Condon*, 182 Wn.2d 307, 343 P.3d 357 (2015). The trial court did not err.

Longshore also argues that the police department's failure to implement protocols for maintaining evidence constituted bad faith. Longshore did not offer any evidence nor any authority supporting the position that a lack of protocol constituted bad faith. Therefore, Longshore's claim fails.

D.    STATEMENT OF ADDITIONAL GROUNDS

Longshore makes various arguments in his SAG. We address only the issues that may arise on remand or may be dispositive of this case.

1.    Sufficiency of the Evidence

Longshore argues that the State presented insufficient evidence of premeditation and the aggravating circumstances. In evaluating a sufficiency of the evidence claim, we assume the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). We defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Id.* "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

a.    Premeditation

Longshore argues that there was insufficient evidence of premeditation. We disagree.

"Premeditation must involve 'more than a moment in point of time,' but mere opportunity to deliberate is not sufficient to support a finding of premeditation." *State v. Pirtle*, 127 Wn.2d

No. 47030-6-II

628, 644, 904 P.2d 245 (1995) (citation omitted) (quoting RCW 9A.32.020(1)). Premeditation is

the deliberate formation of and reflection on the intent to take a human life, and includes the mental

process of thinking beforehand, deliberation, reflection, weighing, or reasoning for some period of

time. *Id.*; RCW 9A.32.020(1). Particularly probative evidence of premeditation includes evidence

of a motive to kill and evidence of a manner of killing suggesting prior reflection or planning. *See

id*. "Premeditation may be proved by circumstantial evidence where the inferences drawn by the

jury are reasonable and the evidence supporting the jury's finding is substantial." *State v. Gentry*,

125 Wn.2d 570, 598, 888 P.2d 1105 (1995). "Circumstantial evidence that the defendant brought

a weapon to the scene and fired multiple shots supports the reasonable inference of premeditation."

*State v. Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007).

A number of appellate cases have considered the sufficiency of evidence with respect to

premeditation and demonstrate that a wide range of proven facts will support an inference of

premeditation. *See, e.g.*, *State v. Rehak*, 67 Wn. App. 157, 834 P.2d 651 (1992) (evidence that the

victim was shot three times in the head, two times after he had fallen on the floor, was sufficient

to establish premeditation); *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340 (1990) (evidence that

the defendant brought a gun to the murder site supported finding of premeditation); *State v.

Longworth*, 52 Wn. App. 453, 761 P.2d 67 (1988), *review denied*, 112 Wn.2d 1006 (1989)

(evidence that a weapon had been procured, and that the victim was stabbed in the back while

being held by another and was killed to keep her from reporting a burglary, was sufficient to

support a finding of premeditation); *State v. Gibson*, 47 Wn. App. 309, 734 P.2d 32 (1987)

(evidence that there was a sufficient lapse of time between beating and strangling the victim was

sufficient to support a finding of premeditation); *State v. Sargent*, 40 Wn. App. 340, 698 P.2d 598

14

(1985) (evidence that the victim was struck by two blows to the head, with some interval passing between the blows, while she was lying face down, supported a finding of premeditation).

The facts here fit within the range of facts where premeditation has been found proven. Thus, viewing the evidence in the light most favorable to the State, the evidence here supports a finding of premeditation. Longshore deliberately injected himself into the situation between Raphael and Taber. Longshore brought a gun to the scene, pulled the gun out, and hit Taber in head with the gun. Then Longshore took a step back, pointed the gun at Taber's head, and shot her in the head. Longshore then turned to Drake and shot him. After shooting Taber and Drake, Longshore said to Raphael, "[N]o witnesses." Based on this evidence, a reasonable trier of fact could find that Longshore deliberately formed premeditated intent to kill Taber and Drake. Accordingly, Longshore's argument fails.

### b. Aggravating circumstances

The trial court instructed the jury on the following two aggravating circumstances for both counts: (1) there was more than one person murdered and "the murders were part of a common scheme or plan or the result of a single act of the person," and (2) the murder was committed "to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime."[10] The jury found the aggravating circumstances existed for both counts charged.

### i. Common scheme or plan

Longshore argues that there is no evidence of a plan or nexus between the killings because no one knows why the victims were killed. We disagree.

---

[10] RCW 10.95.020(9), (10).

To prove the "common scheme or plan" aggravating circumstance, the State must demonstrate a "'nexus between the killings.'" *State v. Finch*, 137 Wn.2d 792, 835, 975 P.2d 967 (1999) (quoting *Pirtle*, 127 Wn.2d at 661). A "nexus" exists when "an overarching criminal plan" connects the murders. *Id*.

The record supports a reasonable inference that Taber was killed while Longshore was seeking to collect a debt owed by Taber to Raphael. Raphael testified that Longshore was with Raphael because he wanted to earn money, and he was willing to collect debts on behalf of Raphael. Raphael told Longshore that Taber owed him money and pointed her out to Longshore because if Longshore was going to collect debts for him, "that would be the person to collect from." 11 VRP at 1825. Raphael confronted Taber about the debt owed. Taber declined to pay Raphael. Longshore, with gun in hand, walked past Raphael into the house, began yelling at Taber to pay the debt, and struck Taber's head with the gun. When Longshore struck Taber's head, the gun discharged a bullet. Longshore then "took a little step back," pointed the gun at Taber's head, and shot her. 11 VRP at 1836. Longshore then turned and shot Drake. After Longshore shot both victims, Longshore told Raphael, "[N]o witnesses." Based on the evidence, a rational trier of fact could find a nexus between the two killings because Longshore was prepared to kill Taber and anyone she was with when he collected on the debt.

ii.     Conceal the commission of a crime

Longshore contends that the record does not support a finding that he killed in an effort to conceal a crime. The concealment aggravator may be established by evidence that the killing was intended to postpone, for a significant period of time, the discovery of a crime—some crime

other than the murder itself. *State v. Irby*, 187 Wn. App. 183, 203, 347 P.3d 1103 (2015), *review denied*, 184 Wn.2d 1036 (2016).

At trial, Raphael testified that Longshore struck Taber with the gun. The pathologist testified that Taber suffered blunt force trauma to her head. Raphael also testified that after striking Taber, which caused the gun to accidentally discharge, Longshore stepped back, pointed the gun at Taber's head, and shot her. Based on the evidence of Longshore striking Taber and then stepping back to aim and shoot at her, a jury could have found that he shot Taber to conceal the discovery of an assault upon her. And based on the evidence that Longshore shot Drake to get rid of the witnesses, the jury could have found that Longshore committed the second shooting to conceal the first crime. Longshore's argument fails.

2.     Admissibility of Longshore's Statements

Longshore contends that the trial court erred by admitting his statements made on May 28, June 1, and June 4.

Under the Fifth Amendment to the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." Police must give *Miranda* warnings when a suspect is subject to interrogation while in the coercive environment of police custody. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). For purposes of *Miranda* warnings, a suspect is in custody when "a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *Id.* at 218. If an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent or wants an attorney, the interrogation must cease. *Miranda*, 384 U.S. at 473-74.

17

"[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id*. at 474.

a.      May 28 statements

Longshore argues that the trial court erred by admitting his May 28 statements to police because he was effectively in police custody but did not receive *Miranda* warnings.  Longshore's argument fails.

Longshore claims that his May 28 statements were involuntary and improperly admitted because Detective Moran continued questioning him after he asked if he could leave.  However, Longshore's claim is belied by the record.  The record shows that he was not asked substantive questions, nor did he respond substantively, after he said, "I feel like I wish to stop the statement right here."  Pretrial Ex. 3 at 5.  After Longshore said that, Detective Moran asked, "Why is that?" and Longshore expressed that he was feeling uncomfortable, wanted the tape stopped, and wanted to leave if he was not being arrested.  Pretrial Ex. 3 at 5-6.  Detective Moran assured Longshore that he was not being arrested, he was only a witness, and he was "not in any trouble."  Pretrial Ex. 3 at 6.  The recording then stopped.

Longshore was not in custody for purposes of *Miranda*.  When Detective Moran approached Longshore, he was handcuffed near another vehicle.  Longshore had been detained because he was travelling in a car that had attempted to drive through the crime scene perimeter tape.  Initially, Longshore told officers that his name was "Jason Longshore."  2 VRP at 223.  After determining that Jason Longshore had a felony warrant, Sergeant Heldreth put Longshore in handcuffs.  After putting him in handcuffs, Sergeant Heldreth recognized Longshore and realized that he was not Jason Longshore.  Sergeant Heldreth asked Longshore if he would be willing to

talk about "whatever he might know about" Raphael or Raphael's house, and Longshore agreed; Sergeant Heldreth requested that a detective come to them. 2 VRP at 227.

When Detective Moran responded, he determined that Longshore was not under arrest or a suspect. Detective Moran removed Longshore's handcuffs, advising Longshore that he was not under arrest and not in custody. Detective Moran and Longshore walked to Detective Moran's car, where Longshore sat in the front seat with Detective Moran. Longshore was not restrained, and the car was not locked. Detective Moran told Longshore that he did not have to provide a statement and that he was free to leave. Detective Moran testified that Longshore was considered a witness at that point. Longshore agreed to provide a statement. When Longshore asked to stop the interview, Detective Moran assured him that he was not under arrest and that he was just a witness. Longshore then left the scene.

Under these facts, Longshore was not in custody when he gave his statement on May 28. Longshore was only temporarily restrained after giving officers a different name, which was associated with a felony warrant. But prior to giving a statement, the mistaken identity was recognized, and Detective Moran removed Longshore's handcuffs. Longshore was advised that he was not under arrest, was not in custody, and was not a suspect. Accordingly, Longshore was not in custody when he gave a statement on May 28, and his claim fails.

        b.     June 1 statements

Longshore argues that the trial court erred by admitting his statements because he had invoked his right to remain silent during the June 1 police interview.[11] We agree.

_____

[11] In this section, Longshore's argument assumes that he initially waived his *Miranda* rights, but subsequent to that waiver, he unequivocally invoked his right to remain silent. In a related issue,

"Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary." *Heritage*, 152 Wn.2d at 214. Once a suspect unambiguously asserts his right to silence, the interrogation must cease. *State v. Piatnitsky*, 180 Wn.2d 407, 412, 325 P.3d 167 (2014), *cert. denied*, 135 S. Ct. 950 (2015). An unequivocal invocation of *Miranda* requires an expression of an objective intent to cease communication with interrogating officers. *Id*. And "[w]here the initial request to stop the questioning is clear, 'the police may not create ambiguity in a defendant's desire by continuing to question him or her about it.'" *Anderson v. Terhune*, 516 F.3d 781, 790 (9th Cir. 2008) (plurality opinion) (quoting *Connecticut v. Barrett*, 479 U.S. 523, 534 n.5, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987)). However, "under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); *accord Piatnitsky*, 180 Wn.2d at 417.

Longshore does not challenge any of the trial court's findings of facts. Therefore, they are verities on appeal. *State v. Lohr*, 164 Wn. App. 414, 418, 263 P.3d 1287 (2011). Based on its findings, the trial court concluded that Longshore did not unequivocally assert his right to remain silent during the June 1 police interview.[12] We review the trial court's conclusion of law de novo. *State v. Cherry*, 191 Wn. App. 456, 464, 362 P.3d 313 (2015).

---

Longshore argues that the entire June 1 interview was inadmissible because he invoked his right to counsel but was denied.

[12] Here, detectives understood Longshore's statements, at the least, to be an attempt to assert his right to remain silent and terminate the interview. And the trial court framed its ruling as whether Longshore unequivocally asserted his right to remain silent, indicating it too understood Longshore's statements to be, at least, an attempt to assert his right to remain silent.

Here, the trial court found that Longshore understood his rights and agreed to speak with Detective Rhoades. The trial court also found that after one of the several breaks taken during the interview, Longshore said that "if we're not willing to go any further with this investigation to try to apprehend this other dude to f***ing see what's going on then that concludes it, you know and . . . . ." CP at 761. After this statement, Detective Rhoades told Longshore that the interview was over and had Longshore sign a final acknowledgment. Another break was taken and Detective Rhoades and Longshore engaged in "additional dialogue," but when Detective Rhoades asked Longshore if he still did not wish to speak with them, Longshore stated, "I already concluded that f***ing ten f***ing minutes ago and you guys kept asking me questions." CP at 761.

The trial court concluded that Longshore did not invoke his right to remain silent. Specifically, the trial court concluded that Longshore did not invoke his right to remain silent when he said "that concludes it" and signed a final acknowledgment that the interview was ending because he "voluntarily engaged the Detectives in conversation during and shortly after signing the final acknowledgement." CP at 766.

The trial court's conclusion that the defendant was responsible for continuing the conversation ignores the bedrock principle that the interrogators should have stopped all questioning. As the Third Circuit Court of Appeals aptly stated, "[T]he onus was not on [the suspect] to be persistent in her demand to remain silent. Rather, the responsibility fell to the law enforcement officers to scrupulously respect her demand." *United States v. Lafferty*, 503 F.3d 293, 304 (3d Cir. 2007).

Here, Longshore clearly and unequivocally asserted his right to terminate the interview and remain silent when he said "that concludes it" and that he "already concluded that f***ing ten

f\*\*\*ing minutes ago and you guys kept asking me questions." CP at 761. Because Longshore unequivocally asserted his right to silence, the trial court erred by ruling that his subsequent statements were admissible.

### c. June 4 statements

Longshore argues that the trial court erred by admitting his statements made during the June 4 interview because he unequivocally invoked his right to counsel. Specifically, Longshore asserts that he requested counsel when detectives raised the issue of polygraph testing.

Longshore's argument fails because he did not invoke his right to counsel. When detectives asked Longshore whether he would be willing to take a polygraph, Longshore responded by saying:

> I've already told my—the federal um, people—they told me that uh, if [a polygraph] come about to deny it and allow them to be involved with the interview. . . . I told them I have no f\*\*\*ing uh, I have no reason not to um, hide myself from it. . . . . I already told you—just now I already told you that I have nothing to hide. I'm just doing follow through with the recommendation that's made by the attorney to allow—allow them to uh, be a part of it, or anything like that.

Pretrial Ex. 7 at 22-23. Thus, the trial court did not err in concluding that Longshore did not unequivocally invoke his right to counsel during the June 4 interview and admitted the June 4 statements.

### 3. Advisement of Right to Counsel

Longshore argues that he was misadvised of his right to counsel by Detective Rhoades on June 1. Specifically, Longshore argues that his decision to make a statement was not rational and

independent because Detective Rhoades misled him about how quickly he would be appointed an attorney.[13] We disagree.

During questioning, Longshore asked Detective Rhoades how quickly he would be appointed an attorney. Detective Rhoades responded:

> [Y]ou're not gonna have a lawyer appointed for you or to you until you go to court, okay? So that's, you know, you're—it's 3 o'clock in the morning. You're probably gonna go before the court about any time after 9:00 this morning. So they're not gonna appoint an attorney to you until that first court appearance, okay? So having your rights [in] mind, do you wish to answer questions?

CP at 482. Longshore responded, "Yeah." CP at 482. Longshore argues that Detective Rhoades should have followed CrR 3.1(c)(2) and given Longshore access to the telephone and telephone number of the public defender.

CrR 3.1(c)(2) provides that a person in custody who desires a lawyer shall, at the earliest opportunity, be provided access to a telephone and contact information for a public defender. Longshore, however, did not state that he desired a lawyer. Rather, he asked how quickly a lawyer could be appointed. Therefore, Longshore's question did not trigger the application of CrR 3.1(c)(2) and his argument fails.

In conclusion, we hold that the trial court erred in instructing the jury on accomplice liability and that the error was not harmless. With regard to issues raised in the SAG that may be dispositive or may arise on remand, we hold that sufficient evidence supports the jury's finding of premeditation and the aggravating circumstances; the trial court did not err in admitting Longshore's May 28 and June 4 statements; the trial court erred in admitting Longshore's

---

[13] Presumably, Longshore contends that if he had been properly advised by Detective Rhoades, he would have invoked his right to counsel.

23

statements made on June 1 after he unequivocally asserted his right to remain silent; and Longshore's claim that he was misadvised about his right to counsel fails. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.